DAVID MARPLE *et al.*

*v.*

ELLEN V. SCOTT *et al.*

1. SWORN ANSWER IN CHANCERY—*when to be taken as true.* Where the answer of a defendant in chancery is required to be under oath, so far as it is responsive to the bill and fairly meets the allegations of the complainant, it must be received as true, unless it is disproved by evidence amounting to the testimony of two witnesses.

2. INCUMBRANCE—*what constitutes.* An adverse equitable claim to land is not considered an incumbrance.

3 REPLICATION IN CHANCERY—*admissibility of evidence when there is no replication.* While it would be proper, in default of a replication to an answer, to set down the cause for hearing on bill and answer, taking the answer as true, and excluding all evidence, unless it may be matter of record to which the answer refers, yet where the defendant treats the cause as at issue, joins in taking depositions, and consents to set the cause down for hearing on bill, answer, exhibits and depositions, and the cause is heard accordingly, he cannot, on error, invoke the statute in his favor and insist that the proofs shall not be considered.

APPEAL from the Circuit Court of Bureau county; the Hon. MADISON E. HOLLISTER, Judge, presiding.

The opinion of the court contains a statement of the case.

Messrs. KENDALL & IDE, for the appellants.

Messrs. STIPP & GIBON, for the appellee.

Mr. JUSTICE BREESE delivered the opinion of the Court:

Appellants Nelson and Delia Maria, his wife, commenced an action of ejectment in the Bureau Circuit Court against the appellees, to recover the possession of lots four and five in block one, in the town of Sheffield in Bureau county, claiming the premises as the fee simple estate of Delia Maria Nelson.

Pending this action, Ellen V. Scott, the widow, and Franklin L. and Edith L. Scott, infant children of George M. Scott, deceased, filed their bill to restrain the plaintiffs from prosecuting the suit, and for a perpetual injunction, alleging that George M. Scott, in the year 1854, purchased these lots of the Sheffield Mining and Transportation company, paying therefor part in cash, and giving his notes for the balance, and receiving of the company title bonds for the lots, covenanting to make deeds on payment of the notes.

They allege that Scott neglected to put these bonds on record, and either re-delivered them to the company on making a contract with one Eben Boyden, or lost them. It is further alleged that Scott paid the company the notes and had them canceled.

The contract with Eben Boyden is alleged to have been of this nature: That after Scott paid the notes he borrowed of Boyden about one hundred dollars, and arranged with Boyden and the company that they should make a deed to Boyden for the lots, he to hold them as security for the money borrowed, and that Boyden should execute to Scott a bond for a deed on payment of the money borrowed and the interest agreed upon.

It is then alleged, that, in pursuance of this arrangement, the company executed " a written instrument " for the lots to Boy-

den, which has not been recorded, and is alleged to be in the possession of Boyden or of the company.

It is further alleged, that Boyden executed a title bond to Scott for the lots, a copy of which is annexed to the bill; that Boyden used a blank bond, such as used by the company, at the foot of which are the words "Secretary of S. M. and T. Co.," over which Boyden wrote his name; that he was not secretary, and that two days prior to the date of the bond, when this arrangement was perfected, Scott executed to Boyden his note for $153.21, with ten per cent interest after maturity, which sum it is alleged was the consideration for the lots, and it is also alleged, that the note was misdated as being made in 1857, when the true date was 1856. In March, 1857, it is alleged, it was agreed between Scott and Boyden, that the time of payment of this note should be extended six months upon the consideration that Scott should execute to Boyden his note for twenty dollars, for which sum Boyden should hold the lots as security; this note was made, a copy of which is attached to the bill, the signature of Scott being torn off, as alleged, on its payment.

It is further alleged, that Scott paid the first mentioned note to Boyden, and demanded of him a deed, which Boyden refused to execute, claiming that the interest was not all paid, which Scott refused to pay, being usurious interest, but, subsequently, and before Boyden conveyed away the legal title, Scott tendered to him the whole amount of the usurious interest, and demanded a deed, which Boyden refused to execute, and also refused to surrender the note.

The bill then alleges, that Marple, one of the appellants, bought these lots of Boyden, with full knowledge of the equities of Scott, he being apprised, before his purchase, of the transactions between Scott and Boyden, and with the knowledge that Scott was the equitable owner of the premises — that the sale was made by Boyden to Marple, for the purpose of defrauding Scott of his property in the lots. It is then alleged, that a deed was made by the company to Marple at the instance of Boyden, on the 19th of August, 1859; that Boyden

redelivered or destroyed the deed to him which the company had executed, and that the agent of the company, who executed the deed, knew at the time the rights of Scott in the premises.

It is further alleged, that, on October 29, 1860, Marple conveyed these lots to David P. Nelson, he, Nelson, knowing the rights of Scott in the premises before, and at the time of the conveyance, — knowing that the equitable title thereto was in Scott; that Nelson, on the same day, executed a mortgage on the lots to Marple, which Marple foreclosed in the Circuit Court and purchased in the premises.

It is then alleged, that, on the 7th of September, 1861, Nelson, and his wife, Delia Maria, conveyed the lots to Julia Ann Davis; and, on the 25th of October thereafter, she conveyed them, with her husband, Jacob N. Davis, to Delia Maria Nelson, one of the plaintiffs, with the purpose, as complainant Ellen V. Scott alleges, of defrauding George M. Scott, and were so made that the title might pass through persons having no notice of Scott's equities.

It is then alleged, that all these conveyances were made in the life-time of Scott, and that Scott, since his purchase, had been in possession of and greatly improved the lots, they constituting his homestead.

Answers were required of the defendants, under oath; and the prayer was, that Nelson and wife be enjoined from further prosecuting the ejectment suit until the further order of the court, and that, upon the final hearing, the injunction be made perpetual, and that Nelson and wife be required to make a proper conveyance of the lots to complainants, and for general relief.

The bond exhibited with the bill was from Eben Boyden to G. M. Scott in the penal sum of sixteen hundred dollars, reciting an agreement to sell these lots to Scott, on condition that Scott shall pay Boyden one hundred and fifty-three dollars, as follows: note dated January 15, 1857 (1856), for $153.21, with interest at ten per cent after due, and shall pay all taxes on the lots; then Boyden shall execute and deliver a good and sufficient deed to Scott for the lots; with a further stipulation,

that, on failure to pay the note at maturity, the contract should be null and void, and Scott should yield possession of the lots to Boyden on receiving ten days' notice to quit. The note for twenty dollars is also made an exhibit. It is without signature, and payable to Boyden; and contains an agreement that Boyden shall hold security on the lot and house for which Scott held his bond, when a certain note was paid that Boyden held against Scott, and that he, Scott, was not entitled to a deed until that note was paid.

Marple put in his separate answer under oath, admitting that complainants were the widow and minor children of George M. Scott, deceased, who died intestate; but denying all the allegations in the bill which relate to the purchase by Scott of the lots of the company, and the alleged transactions between the company and Scott, the giving the title bond and notes and the payment by Scott to the company, and his being entitled to a deed from the company; and denies all the allegations relating to the transactions with Boyden, and of the alleged arrangement between the company and Scott and Boyden, and all other matters, facts and circumstances connected therewith; and avers he never had any knowledge of the truth thereof, and never had any information thereof, and then only by hearsay, long after his rights had accrued to the lots, excepting, however, that he knew the bare fact that a deed had been made of the lots and delivered by the company to Boyden, conveying the title to the lots to Boyden, but had no knowledge or information of the attendant circumstances.

He admits the purchase by him of the lots from Boyden, and the execution of a deed therefor by Boyden to him, and that he purchased the property as a dwelling to live in with his family, and was to pay $500 therefor by executing his note for that amount. This bargain was in August, 1858; and Boyden was then in the actual possession of the lots, having a tenant residing thereon, and who had resided thereon a long time prior thereto, paying rent to Boyden, and Boyden at the time claimed to be the owner in fee simple of the premises having a deed for them from the company. He avers he purchased

the premises in good faith and for the consideration of $500, and, on the execution of his note for that amount, Boyden executed a deed for the premises; that, about two months after receiving the deed, he and his family went into possession of the lots and continued to live thereon about one year. About the 10th of August, 1859, while he was occupying the lots, Boyden proposed that he should redeliver to him, Boyden, the deed which he had executed, and receive a deed from the mining company; giving, as a reason, that the deed of the company to him was not recorded, nor was the deed from Boyden to Marple recorded, and therefore the expense would be less by taking a deed direct from the company; to which proposition Marple assented, in good faith, as he says, and that he did deliver the deed to Boyden on that day; which deed, together with the deed from the mining company to Boyden, was destroyed by Boyden, and a new deed made out by the company directly to Marple, conveying these lots, by direction of Boyden and with the consent of the company. This deed bears date August 10, 1859, and was delivered to Marple on that day, and filed for record on the 21st of March, 1860, and duly recorded.

The answer further alleges, that, at the time he purchased the premises from Boyden in 1858, and received the deed from Boyden, and prior thereto, he had no knowledge, notice, or information, either actual or constructive, of Scott's alleged equities, if any such ever existed; that he acquired his right to the premises in good faith, and for a valuable consideration, and without notice of any other claim than that Boyden owned the premises, and without any notice that Scott claimed any interest therein; nor had he, at the time of receiving the deed from the company, or prior thereto, any knowledge of the dealings of Scott with the company, or that Scott was entitled to a deed from Boyden; but he charges, that he is informed, if any such matters existed between Scott and Boyden, they were fully settled by them, long before he, Scott, relinquished to Boyden all claims on the lots to Boyden, and that, at the time he, Marple, took possession, Scott was not in this State,

and Boyden was in the possession of the premises, claiming to be the owner. Marple also denies all knowledge, on the part of Nelson, of those equities of Scott, and avers, when he conveyed to Nelson, he, Marple, was in the exclusive possession of the premises, having a tenant on them for more than a year before he conveyed to Nelson, without interference from Scott or any one else; that Nelson engaged to pay him $800 for the property, a part of which was paid down, and note and mortgage taken for the balance of $100, the mortgage foreclosed, and the premises bought in by him, Marple, and the same was not redeemed. Marple denies all knowledge of conveyances, subsequent to his deed to Nelson, knows nothing of the possession of the premises by Scott, but avers, that, for a long time prior to the purchase from Boyden, Scott was not in possession, but the possession was in Boyden, and since the purchase they have been in possession of Marple for two years, and so remained up to the time when Julia Ann Davis received her deed, and, while she with her husband was moving into the premises, Scott and complainants took forcible possession of them, without the consent or license of Marple or any of his grantees. It is also averred, that nearly all the improvements on the premises were made by Boyden and Marple, while they respectively owned the premises, he, Marple, having applied more than $300 to such improvements. He also avers, that the records of Bureau county contained no evidence of any such contracts or bond as set out in the bill, when he obtained his title, that he relies upon the deed made by the company to Boyden, and the conveyance of Boyden to him as well as on the deed from the company direct to himself, as evidence of his title to the lots.

The joint and several answer of the Nelsons alleges ignorance of all the matters in the bill, and neither admits nor denies the purchase of the lots by Marple of Boyden, — he being ignorant of the transaction, — but sets up the deed from the company to Marple of the 10th of August, 1859, denies all knowledge of the equities set up in the bill, and that Julia Ann Davis had no knowledge of these equities, either at the time or prior to the conveyance to him; and that all the conveyances were

made and accepted without notice of any of these equities, and upon a valuable consideration. The dates of the recording the several deeds are averred, and when they were filed for record no such bonds and contracts as set forth in the bill were on record — denies all knowledge of possession by Scott at any time, but avers possession in Marple, and also avers the forcible entry in the night-time by Scott into the premises, when Davis was preparing to move into them. This answer was also put in under oath.

No replications were filed to either of the answers, but much testimony was taken by both parties without objection, and the cause heard on the bill, answers, and exhibits, and depositions.

The court entered a decree for the complainants, and found that Scott, in his life-time, purchased lot four from the mining company, and lot five from the grantees of that company, and held title bonds from the mining company which were not recorded; that Scott paid the entire purchase-money for the lots; that the arrangement between Scott and Boyden amounted to a mortgage; that Boyden refused to make a deed to Scott; that Marple purchased the lots of Boyden with knowledge of Scott's equities; that the transfers from the Nelsons to Julia Ann Davis, and from her to Delia Maria Nelson, were made for the purpose of avoiding and defeating the equities of Scott and the complainants; that the complainants are in possession of the lots; and that the allegations are true; and decreed that the injunction be made perpetual, and required Nelson to convey the premises to the heirs of Scott within ten days, and that defendants pay the costs.

Marple brings the case here by appeal, and assigns various errors. No appearance is entered by appellee, or brief filed, and no question of law raised and discussed.

The case is submitted on the evidence, which we have carefully examined and considered.

The whole case turns upon notice to Marple and his grantees of these equities set up by the complainants. The answers were called for on oath, and all the defendants aver on oath that they had no knowledge of these equities when they pur-

chased or prior thereto.  Are the answers of either one of the defendants disproved by the testimony of two witnesses, or of one witness and corroborating circumstances?

There can be no doubt, from the testimony of H. C. Porter, the secretary of the mining company, that the payment by Boyden of the notes held by this company for the purchase-money of these lots, was made by Boyden for the benefit of Scott, and that he, Boyden, on taking the deed from the company for the lots, became the trustee for Scott for the title.  In equity, Boyden could have been compelled to convey to Scott on his refunding to Boyden the money received of him.  But another arrangement was entered into, which was, the execution by Boyden to Scott of the title bond dated January 17, 1857.  It is under this bond the equities of complainants arise. It seems, from the testimony of Hartley, the first witness examined on the part of complainants, that he became the assignee of this bond on his sale to Scott of a horse, and as indemnity for signing a note to one Fulk as security for Scott, and which Scott had given to Fulk, with the understanding, when Scott paid for the horse and paid the note to Fulk, he should surrender the bond to Scott, it being assigned as collateral merely, and also surrender the possession of the premises to Scott, they being in Hartley's possession, on the transfer of the bond; and he put Albert Boyden in possession, who was to pay the rent in repairs on the house.  Albert Boyden was to hold the premises until the rent at four dollars per month should re-imburse him for the repairs.  Hartley surrendered the bond to Scott or to Mrs. Scott.  This lease to Albert Boyden was verbal only, and Eben Boyden was present when this arrangement was made, and claimed to be the owner of the premises, and said he could defeat Hartley in a court of law, as his papers were not recorded.  In a conversation, about this time, between Eben Boyden and Scott, Boyden contended that Scott owed him seventy dollars on the lots, but Scott insisted he owed him but forty dollars, and said he would pay him.  This was soon after the transfer of the bond to Hartley, which was on the 14th of March, 1857.

To prove notice by Marple of Scott's claim, Albert G. Scott deposed, on the part of the complainants, in answer to the interrogatory if he had ever heard Marple say any thing in connection with the purchase of lots four and five in block one, that he heard Marple say he had bought the Scott property of Eben Boyden,—said he had a warranty deed from Boyden, and considered that good. This conversation was on the day Marple purchased the lots. On being asked by Scott if he had a good title, he replied that he had a warranty deed, and considered that good. This conversation was the last of July or first of August, 1859, and Marple was then living in the town of Gold. Albert Boyden was then living on the premises in controversy.

For the purpose of showing knowledge on the part of Nelson and wife of the claim of Scott, Allen S. Lathrop deposed, on behalf of complainants, that he heard Nelson say he had traded with Marple for a couple of town lots, with a house on one of them, in Sheffield, occupied by Mrs. Fellows. This was in the morning of the day he was to go to Sheffield to have the writings made. Nelson said he had given Marple eighty acres of timbered land and a wagon, horse, harness, buffalo skin and whip, and two hundred dollars, and received a cow in addition from Marple. Nelson then told him of some incumbrances on the lots, but don't recollect that Scott's name was mentioned, but "it was somebody and old Mr. Boyden that had a hand in it." He did not state the nature of the incumbrances, but this witness told him he would never get possession of the place or receive a dollar back he had paid. To this, Nelson replied, if he did not get the property Marple was good to him; that he ran no risk in that respect. This witness does not recollect that the name of Scott was mentioned, but it is his impression that the name of Scott was mentioned, for it run in his mind "that it was the father of that Scott (A. G. Scott) that was here to-night." Had known Nelson about two months prior to this conversation, and he had lived in Bureau county about that length of time. Heard Nelson say he had sold the premises to Davis, which sale took place nearly a year after

Nelson purchased of Marple. This witness is not sure that this conversation occurred on the day Nelson went to Sheffield to close the bargain.

This is all the testimony in the record going to show knowledge on the part of Marple or of Nelson of any equity in Scott. The rule is well established, that, where the answer of a defendant in chancery is required to be under oath, so far as it is responsive to the bill and fairly meets the allegations of the complainant, it must be received as true unless it is disproved by evidence amounting to the testimony of two witnesses. *Stouffer* v. *Machen*, 16 Ill. 553.

The evidence of A. G. Scott may raise a presumption of knowledge on the part of Marple that George M. Scott had, at some time, a claim of some kind on these premises, inasmuch as it was spoken of as "the Scott property," but the evidence is not of that positive and conclusive character which is required to overcome a sworn answer in chancery. There is no circumstance in the case connected with this testimony strong enough to bring home a knowledge of Scott's equity to Marple, and thus overcome his sworn answer. He swears positively, that, at the time he purchased the premises from Boyden, in 1858, and received his deed from Boyden, and prior thereto, he had no knowledge, notice or information, either actual or constructive, of Scott's alleged equities; that he acquired his rights in good faith, and for a valuable consideration, without notice of any other claim than that Boyden owned the premises, and without any notice that Scott claimed any interest therein; that Scott was not in the State, and Boyden was then in the possession of the premises. The mere declaration that he had purchased the Scott property, and made to a party having no interest in the subject, cannot, unattended by other circumstances, outweigh this sworn answer of the defendant Marple.

The same may be said of knowledge on the part of Nelson. The testimony of Lathrop amounts to but little. It is quite insufficient to overcome Nelson's answer, which is as positive as Marple's. In that conversation, incumbrances on the prop-

erty were alone spoken of, and an adverse equitable claim is not considered an incumbrance. No claim of Scott to the premises was spoken of, and the only visible incumbrance on them was the possession of Mrs. Fellows, if that could be deemed an incumbrance. The testimony by which to charge Nelson with this knowledge is very weak, and too vague, shadowy and indefinite to prevail against his answer.

A careful consideration of the testimony has not led us to the same conclusion to which the Circuit Court arrived. We find the transaction between Eben Boyden and Marple to have been a fair one, and that the consideration was fully paid by Marple to Boyden, who held the legal title, and that Marple entered into possession of the premises, and so remained for a year or more, when he sold them for a valuable consideration paid to Nelson, neither of these parties having any actual or constructive notice of the equities, if any existed, of complainant's ancestor, George M. Scott.

We have refrained from any comments on the testimony of Niles, a witness on behalf of the defendants, who deposed to a settlement in February, 1857, between Boyden and Scott, of all their business matters pertaining to these premises, for the reason, that it has not seemed to us necessary to cumber this opinion with that testimony, no sufficient proof of knowledge of any equity in Scott having been established against Marple or Nelson.

It was insisted by the counsel for the plaintiffs in error, that, inasmuch as no replication had been put in to their sworn answers, no evidence of any kind could be received by the court.

The statute provides, that, in default of filing a replication, the cause may be set for hearing upon the bill and answer, in which case the answer shall be taken as true, and no evidence shall be received, unless it may be matter of record to which the answer refers. Scates' Comp. 142.

It would have been undoubtedly proper and in strict accordance with the statute so to have set down this case, had not the defendants treated the cause as at issue, and joined in taking

the depositions of the several witnesses, and consenting to set down the cause for hearing on bill, answer, exhibit and depositions. To this they have assented, and cannot now invoke this statute in their favor.

For the reasons we have given, the decree of the Circuit Court must be reversed and the cause remanded.

*Decree reversed.*